IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CLIFFORD and DORA MAE MILES,  )  <br>  individually and as legal guardians and  )  <br>  grandparents of C. M., a minor,  )  <br>  )  <br>  Plaintiffs,  )  <br>  )  <br> vs.  )  <br>  )  NO. CIV-06-1431-D <br> CUSHING PUBLIC SCHOOLS  )  <br>  INDEPENDENT DISTRICT NO. 67;  )  <br>  CUSHING BOARD OF EDUCATION;  )  <br>  CHUCK GREER, in his official capacity;  )  <br>  FRANK DENNEY, in his official capacity;  )  <br>  JANET BOZWORTH, in her official capacity; )  <br>  SHAWN HUBBLE, in his official capacity;  )  <br>  EDDIE WILLIAMS, in his official capacity;  )  <br>  FIVE STAR INTERLOCAL  )  <br>  COOPERATIVE; and FIVE STAR  )  <br>  INTERLOCAL BOARD OF DIRECTORS,  )  <br>  )  <br>  Defendants.  )  | |

ORDER

Before the Court is the Defendants' Motion for Summary Judgment [Doc. No. 63], seeking judgment on Plaintiffs' claims under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12165 ("Title II"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) ("§ 504"). The parties have fully briefed their respective arguments.[1]

Plaintiffs' claims are based on Defendants' alleged acts or omissions involving Plaintiffs' grandson, C. M., who has cerebral palsy and has been severely disabled since birth. C. M. is a student at Harmony Elementary School ("Harmony"), in the Cushing Public School system, and has

---

[1] In their reply brief, Defendants ask the Court to strike several witness statements submitted by Plaintiffs as exhibits to their response brief. That motion is addressed in a separate order.

attended Harmony since kindergarten. On November 10, 2005, C.M. fell from a changing table at Harmony, while his diaper was being changed; on May 8, 2006, he again fell from a changing table at Harmony. At the time of these incidents, he was a fifth grade student.

In their first claim for relief, Plaintiffs contend that Defendants have violated Title II because they were deliberately indifferent to C.M.'s disability and failed to reasonably accommodate his disability. Plaintiffs' second claim for relief alleges that these same alleged acts and omissions constitute a violation of § 504.[2]

Summary Judgment Standard:

Summary judgment is proper where the undisputed material facts establish that a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one which may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). To dispute a material fact, the non-movant must offer more than a "mere scintilla" of evidence; the evidence must be such that "a reasonable jury could return a verdict" for her. *Id.* The facts and reasonable inferences therefrom must be viewed in the light most favorable to the nonmoving party. *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005).

If the undisputed facts establish that a plaintiff cannot prove an essential element of a cause of action, the defendant is entitled to judgment on that cause of action. *Celotex*, 477 U.S. at 322. However, a defendant need not disprove a plaintiff's claim; it must only point to "a lack of evidence" on an essential element. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.

---

[2]Plaintiffs also assert state law claims based on negligence, "negligent hiring/training/supervision/ retention," and "loss of affection/enjoyment." Defendants do not seek judgment on these claims.

1998). The burden then shifts to the plaintiff to go beyond the pleadings and present facts, admissible in evidence, from which a rational trier of fact could find in favor of the plaintiff; conclusory arguments are insufficient, as the facts must be supported by affidavits, deposition transcripts, or specific exhibits. *Adler,* 144 F.3d at 671-72.

Section 504 of the Rehabilitation Act:

Section 504 prohibits a program receiving federal funds from discriminating against disabled persons who are otherwise qualified to participate in the funded program. 29 U.S.C. § 794(a). A *prima facie* case under § 504 requires proof that (1) the plaintiff is handicapped as defined by the Rehabilitation Act[3]; (2) he is otherwise qualified to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against plaintiff. *Hollonbeck v. U.S. Olympic Committee,* 513 F.3d 1191, 1194 (10th Cir. 2008); *Powers v. MJB Acquisition Corp.,* 184 F.3d 1147, 1151 (10th Cir.1999).

In this case, Defendants acknowledge that they receive federal funds, that C. M. is a handicapped individual as defined by § 504, and that he is qualified to participate in Defendants' educational programs. They argue, however, that the undisputed facts establish that Plaintiffs cannot prove that Defendants discriminated against C. M.

To prevail on their § 504 claim for compensatory damages, Plaintiffs must prove intentional discrimination; however, intentional discrimination does not require proof of "personal animosity or ill will." *Powers,* 184 F.3d at 1153. Instead, "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Id.* Although one circuit court has held

---

[3]*The Rehabilitation Act uses the term," handicapped," while the ADA refers to "disabled" individuals. Court decisions interpret these terms interchangeably.*

3

that § 504 requires a showing of bad faith or gross misjudgment by a defendant,[4] the Tenth Circuit has not adopted that view, and applies the deliberate indifference standard. *Swenson v. Lincoln County School Dist. No. 2*, 260 F. Supp. 2d 1136, 1147 (D. Wyo. 2003) (citing *Powers*, 184 F.3d at 1153).

Title II of the ADA:

Title II of the ADA ("Title II") prohibits discrimination by a "public entity"[5] against disabled persons. 42 U. S. C. § 12132. Under Title II, qualified persons with disabilities cannot be excluded from participating in, or be denied the benefits of, the "services, programs, or activities" of a public entity, or "be subjected to discrimination by such entity." *Id.* In contrast to § 504, Title II does not require that the public entity receive federal funds. Otherwise, the elements of a cause of action under these statutes are the same, as Congress has directed courts to construe the ADA as giving at least the same amount of protection as the Rehabilitation Act. *See* 42 U.S.C. § 12201(a); *see also Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 608 n. 7 (10th Cir.1998) (citations omitted) (Congress "intended judicial interpretation of the Rehabilitation Act to be incorporated by reference when interpreting the ADA.").

A cause of action under Title II may be based on disparate treatment of a disabled individual by a public entity, a disparate impact resulting from the entity's practices or policies, or the refusal of the public entity to provide a reasonable modification necessary to permit the participation of disabled individuals in services or programs. *Swenson,* 260 F. Supp. 2d at 1144 (citing *Tsombanidis*

---

[4]*See Birmingham v. Omaha Sch. Dist.,* 220 F.3d 850 (8th Cir. 2000). Wood v. President and Trustees of Spring Hill College, 978 F.2d 1214, 1219 (11th Cir. 1992) has also been construed as adopting a bad faith standard.

[5]The term "public entity" includes "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U. S. C. § 12131(1). Defendants do not dispute that a public school system is a public entity covered by Title II.

*v. City of West Haven*, 180 F. Supp. 2d 262, 283 (D. Conn. 2001). To prevail on a Title II claim, a plaintiff must prove that: (1) he is a qualified individual with a disability; (2) he was excluded from the benefits or services of a public entity or otherwise was discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination occurred because of his disability. *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir.1999).

Whether Title II, like § 504, requires proof of intentional discrimination has not been decided by the Tenth Circuit. Citing *Davoll v. Webb*, 194 F.3d 1116, 1142 (10th Cir. 1999), Plaintiffs suggest that *Davoll* indicates intent may not be required. However, Plaintiffs agree that, in *Davoll*, the Circuit expressly declined to decide that question.[6] Moreover, a later Tenth Circuit decision interpreted *Davoll* as "suggesting, but not explicitly holding, that proof of intentional discrimination is <u>required</u> for compensatory damages under Title II." *Moseley v. Board of Education of Albuquerque,* 483 F.3d 689, 693 (10th Cir. 2007) (emphasis added).

At least three other circuits have held that a Title II claim for compensatory damages requires proof of intentional discrimination; each has determined that, as with § 504, intent may be shown by proof of deliberate indifference. *See Powell v. National Bd. of Medical Examiners*, 364 F.3d 79, 89 (2d Cir. 2004); *Delano-Pyle v. Victoria* County, 302 F.3d 567, 574 (5th Cir. 2002); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). The only district court within the Tenth Circuit to address the question has also held that Title II requires intent and that the deliberate indifference standard applies. *Swenson,* 260 Supp. 2d at 1147.

---

[6] *In <u>Davoll</u>, the Circuit rejected a challenge to jury instructions which omitted the requirement of intent in a Title II claim, finding the instruction a "plausible interpretation of the law." 194 F.3d at 1142. In reaching that conclusion, the Circuit observed that intent is required where claims are asserted against recipients of federal funds. Id. Because Title II is not limited to such recipients, the Circuit acknowledged that it could be argued that § 504's intent requirement does not apply to Title II. Id. However, it expressly declined to consider that issue.*

In this case, the parties' arguments apply an intent requirement for both § 504 and Title II, and both present arguments in the context of a deliberate indifference standard. Plaintiffs argue that, assuming their Title II claim requires intentional discrimination, their burden is satisfied by showing deliberate indifference. Defendants do not argue that a more stringent standard applies to Title II, but contend that Plaintiffs cannot establish deliberate indifference. The Court concludes that the deliberate indifference standard of proof applies to both federal claims. Therefore, the question presented is whether the undisputed material facts establish that no reasonable jury could find that Defendants were deliberately indifferent to the strong likelihood that a violation of federally protected rights would result from Defendants' acts or omissions. *Powers*, 184 F.3d at 1153.

Undisputed Material Facts:

The parties' briefs[7] and the evidence before the Court establish that certain facts are not disputed. The parties agree that C.M. has been severely disabled since birth as a result of cerebral palsy. Plaintiffs Cliff and Dora Mae Miles are his grandparents and legal guardians. Since entering kindergarten, C.M. has attended Harmony in the Cushing Public Schools Independent District No. 67 ("Cushing schools"). During the 2005-06 school year, he was a fifth grade student. Pursuant to the terms of the Individualized Education Program ("IEP") developed for C.M. in accordance

---

[7]*As Defendants point out, Plaintiffs did not include in the body of their response brief a section expressly responding to the statement of undisputed facts presented in Defendants' brief. Instead, Plaintiffs included their responses in an appendix. Defendants correctly argue that Plaintiffs' failure to include their responses in the body of their brief violates the Local Civil Rules. LCvR 56.1(c). Plaintiffs' response in the appendix complies with the content required by the local rule, but the use of an appendix effectively allowed them to include more argument in the body of the brief and avoid the 30-page limit without seeking leave to file an oversized brief. LCvR 7.1(e). Although Plaintiffs' disregard of this Court's rules cannot be condoned, the Court notes that the response brief itself also disputes Defendants' factual contentions; thus, the Court will not deem those facts admitted. Plaintiffs are cautioned, however, that any future failure to comply with the Local Civil Rules may result in sanctions, and noncompliant briefs or filings will be stricken or disregarded.*

with federal law, C.M. attended special education classes for a portion of the day, and was in a regular classroom for the balance of the day.

Defendant Five Star Interlocal Cooperative ("Five Star") is an entity organized by 22 public school districts in five Oklahoma counties for the purpose of providing special education services to severely and profoundly disabled students in those districts. These services are provided by teachers, aides and therapists employed by Five Star to work with the disabled students in the districts served by Five Star, including the Cushing schools. Five Star receives federal funds to assist with the services it provides. Nancy Anderson is the Director of Five Star, and held that position during the time period relevant to Plaintiffs' claims. Gayle Hensch, a Five Star employee assigned to Harmony, was C.M.'s special education teacher during the 2005-06 school year; she had worked with C.M. since her hiring in 2003. When she was hired as a special education teacher at Harmony, Hensch had no certification or formal training in special education; no background check was performed prior to her employment. Hensch Deposition ("Dep."), Plaintiffs' Exhibit ("P.Ex.") 4, pp. 30, 31-35. Her only training was observing a special education class for two to three days. *Id.*, p. 33, lines 1-10, 24-25; p. 34, line 1. She also had no training in dealing with disabled children. *Id.*, p. 35, lines 8-12.

The Oklahoma State Department of Education ("OSDE"), division of Special Education Services, is responsible for reviewing Five Star and the Cushing public schools to ensure their compliance with federal regulations regarding disabled students. Enacted pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U. S. C. § 1400 *et seq.*, the regulations require, *inter alia*, that an IEP be prepared for each disabled student; the IEP must be regularly reviewed with the student's parents and those assisting in his education. *See* 34 C. F. R. § 300 *et*

*seq.* Specific regulations applicable to the IEP are summarized in the OSDE December 16, 2005 report in response to Cliff Miles' complaints regarding the Cushing schools ("OSDE report"). P. Ex. 2.

The OSDE report includes, *inter alia*, summaries of the IEP review sessions regarding C.M. from August 24, 2004 through September 15, 2005. Each of the periodic IEP reviews summarized provides that, among the supplementary aids and services to be provided for C.M. was a "one on one assistant." P. Ex. 2, page 8 ¶¶ 1, 2 and 5. The IEP reviews also note that C.M. requires transportation in a specially equipped school bus. *Id.*, page 8 ¶¶ 1, 5.

It is not disputed that C.M. is able to sit with torso support, using a manual or motorized wheel chair and several forms of adaptive chairs. However, he "needs constant supervision to drive" the motorized wheelchair. P. Ex. 2, page 7, "Findings," at ¶ 3. He communicates through "facial expressions, vocalizations, yes/no head movements and augmentative communication devices such as communication boards, a light point on a headband, and switches," and he requires assistance with eating, including the use of special utensils and physical support, as well as with using the bathroom. *Id.* His grandparents purchased augmentative communications devices for his use.

The parties do not dispute that, because of his disability, C.M. wore diapers during the school day and that teachers or aides changed his diapers. It is also not disputed that, while having his diaper changed at Harmony, C.M. fell from the changing table on November 10, 2005 and on May 8, 2006.[8]

In addition to the foregoing undisputed facts, the record before the Court establishes material factual disputes regarding Plaintiffs' deliberate indifference allegations. For the reasons set forth

---

[8]*Plaintiffs allege that these incidents seriously injured C.M. and that surgery was later required. These allegations are not the subject of Defendants' motion and are not addressed herein.*

in the following discussion, the Court concludes that those disputed material facts preclude summary judgment on Plaintiffs' § 504 and Title II claims.

Discussion:

Cliff Miles contends that, during the 2004 and 2005 school years, he complained to Ms. Hensch and others about several concerns regarding C.M.'s safety both in the classroom and while he was transported on a school bus. Specifically, he learned that, on at least one occasion, C.M. was transported in a school bus that was not specially equipped for disabled students. Miles Dep., P. Ex. 5, p. 164. Hensch admitted in her deposition that C.M. was transported on a regular bus when the specially equipped bus was not available; she also transported him in her personal vehicle or a school vehicle on more than one occasion, and those vehicles were not specially equipped. Hensch Dep., P. Ex. 4, pp. 129-132. Hensch testified that she was not concerned about C.M.'s safety on the non-equipped bus because she believed the odds were against an accident, stating that she was "playing the odds." *Id.* at pp. 135-36.

The record also reflects that, on several occasions, Miles complained that C.M. did not have qualified aides to assist him, as required by the IEP; he was concerned about the insufficient number of aides, their lack of experience or qualifications, and that many had been hired without a background investigation. Miles Statement to Five Star's October 13, 2005 Board meeting, P. Ex. 12; Board response of October 13, 2005, P.Ex. 13. Anderson testified that Miles complained to her about the lack of qualified aides. Anderson Dep., P. Ex. 1, p. 114, lines 2-8. According to Anderson, there was a significant turnover in the aides employed at Harmony; she testified that, from the beginning of the 2005 school year through November 22, 2005, there were 17 different aides working with the special education class. *Id.*, p. 89. Anderson testified that background checks

were "probably not" completed on any of those assistants. *Id.*

Hensch was also concerned about the lack of qualified aides as well as the constant turnover in aides; when Five Star did not hire new assistants, Hensch decided to hire an aide on her own, and she paid the aide with her personal funds. Hensch Dep., P. Ex. 4, p. 221. Hensch was later formally admonished for doing so. *See* "Formal Admonishment and Plan of Improvement," from Anderson to Hensch, P.Ex. 6, p. 2.

Because of his severe disability, C.M. is required to wear diapers, which must be changed during the school day; this has been the case since he entered kindergarten. He is confined to a wheelchair, and must be lifted from the chair and placed on a changing table. In 2005, the changing table utilized for this purpose was a standard folding table, approximately 34 inches from the floor; it had no bars or straps or other devices to secure the child being changed. A photograph of the table is submitted as Plaintiffs' Exhibit 16.

Miles contends that, from the time C.M. entered kindergarten, Miles repeatedly complained that the changing table was not safe . Miles Dep., P. Ex. 5, p. 113, lines 13-25; p. 114; p. 118, lines 13-25; p. 119, lines 1-13. He testified that he initially complained to Harmony principal Linda Manning, who explained that Five Star was responsible for providing special needs equipment; he also testified that he repeatedly discussed the changing table with Anderson and that he ultimately complained to Eddie Williams, Cushing school Superintendent and a member of the Five Star Board of Directors. Miles Dep., P. Ex. 5, p. 118, lines 13-25; p. 119, lines 1-13. According to Miles, these complaints were ignored. Although Defendants acknowledge that Miles made these complaints during the first few years C.M. attended Harmony, they contend that he did not do so after the 2002 school year. Anderson denies that such complaints were addressed to her, and she contends that

she was not aware that Miles had expressed complaints about the changing table to others. Anderson affidavit, D. Ex. 11. Defendants also note that the same table was used throughout this time period, and C.M. did not fall until November of 2005.

Hensch changed C.M.'s diapers during the school day. She was aware that C.M. was prone to uncontrolled spastic movements and that he was able to roll. Hensch Dep., P. Ex. 4, p. 92, lines 5-8; p. 95, lines 19-25; p. 96, lines 1-2. She noted that, beginning in 2005, he "wiggled" and moved away from the wall while he was being changed. *Id.*, p. 102, lines 1-17. She did not recall reporting to anyone that he might be able to roll off the table. P. Ex. 4, p. 102, lines 18-25. She was "pretty sure he would stay on the thing." *Id.*, lines 7-8.

Miles contends that, after expressing his complaints about the lack of qualified aides and the safety issues to both Anderson and Williams, he was dissatisfied with their responses, and felt that he was being ignored. Miles dep., P. Ex. 5, p. 165. He requested an opportunity to present his concerns to the Five Star Board and, on October 13, 2005, Miles attended the monthly meeting of Five Star's Board of Directors. He presented a list of grievances which included the lack of trained aides, the failure to provide a potty chair for C.M. at Harmony[9], the fact that C.M. had been transported on a regular school bus or in Hensch's private vehicle, and the failure to provide regular progress reports regarding C.M. A copy of Miles' written complaints presented to the Board is submitted as Plaintiffs' Ex. 12. Miles told the Board that he had repeatedly met with Anderson to

---

[9]According to Miles, he asked Nancy Anderson at the beginning of the 2003 school year to arrange for a potty chair for C.M.'s use at Harmony because C.M. had begun potty training during a summer program for disabled children, and Miles wanted to continue that training during the school year. Miles statement, P. Ex. 12. The chair was not provided, and Miles again asked Anderson to obtain a chair in 2004; in the interim, he had purchased a potty chair for C.M.'s use at home, and he provided information regarding that chair to Anderson for her use in ordering an appropriate chair. *Id.* A chair was not provided. However, the record indicates that, at some time in 2005, a chair was obtained, as Hensch mentioned it in her deposition. Hensch Dep., D. Ex. 5, p. 88, lines 20-25; p. 89, lines 1-4.

voice his concerns and that he ultimately met with Williams. *Id.*

According to Anderson, a letter to Miles was prepared immediately after the meeting. Anderson Dep., P. Ex. 4, p. 122. The letter to Miles, submitted as Plaintiffs' Exhibit 13, provides in part, "[w]ith your issues regarding the classroom teacher, an investigation has been conducted and appropriate administrative action has been taken." P.Ex. 13. The letter also assured Miles that Five Star was taking applications to fill vacancies resulting from the resignations of classroom aides. *Id.*

Plaintiffs contend that the investigation referenced in the letter had not taken place, and that Anderson did not counsel with Hensch until later in November, 2005, as reflected in her notes of a November 18, 2005 session with Hensch to "discuss some issues brought up by Cliff Miles." P. Ex. 15. As Plaintiffs point out, this meeting was approximately one week after C.M.'s first fall from the changing table on November 10, 2005. The record reflects that, on February 6, 2006, Hensch was formally admonished by Anderson. P. Ex. 6. The letter to Hensch discussed numerous deficiencies, including safety issues regarding C.M. and other disabled students.

It is not disputed that, after his October 13, 2005 meeting with Five Star's Board, Miles submitted a written complaint to the OSDE. A copy of his October 25, 2005 complaint is submitted as Plaintiffs' Exhibit 20. Among his complaints were the failure to provide one-on-one assistants for C.M. and the failure to provide adequately trained assistants. P.Ex. 20. Miles also complained that Defendants had transported C.M. on a school bus which was not specially equipped and that Hensch had transported him in her personal vehicle. *Id.* He also complained that Plaintiffs did not receive regular progress reports regarding C.M., and expressed concerns about the physical education facilities available for C.M..

The record reflects that, when the OSDE investigated Miles' complaint, it found Defendants had failed to comply with applicable federal regulations by :1) failing to ensure that a specially equipped school bus was used to transport C.M. ; 2) failing to provide a one-on-one assistant or aide for C.M.; and 3) failing to provide to C.M.'s guardians the required progress reports. Plaintiffs' Ex. 2, p. 13. The Cushing Schools were directed to take corrective action regarding "transportation, safety issues, and the lack of a dedicated teacher assistant" for C.M. *Id.*

It is not disputed that, on November 10, 2005, C.M. fell from the changing table onto the floor. At the time, Ms. Hensch was changing his diaper without the assistance of another person; she moved away from the table to dispose of the soiled diaper, and he rolled over and fell. Although she tried to catch him before he fell, she was unable to do so. Accident and Injury Report, D. Ex. 6; Hensch Dep., P. Ex. 4, p. 155, lines 1-21. Hensch believed that it would have been prudent to have two people present when C.M. was being changed. Hensch Dep., P. Ex. 189, lines 4-7.

Anderson did not believe it was necessary to have two persons present when a child was being changed; after C.M.'s fall, however, she began requiring that two aides be present . Anderson Dep., P. Ex. 1, p. 172, lines 13-21. Anderson told Williams that she had directed that two people be present when C.M. was being changed. Williams Dep., P. Ex. 3, p. 72, lines 1-9.

After C.M.'s November 10 fall, Hensch recalled discussions about obtaining a new table, and that Miles probably raised that point; however, she did not recall any details. *Id.*, p. 189, lines 8-14. A new changing table was obtained in late December 2005 or early January 2006. The date on which the table was ordered is unclear. Anderson testified that she had ordered a new table prior to C.M.'s November 10, 2005 fall and that she had asked the Five Star physical therapist to recommend a new table Anderson Dep., P. Ex. 1, p. 178-179. However, Anderson also testified

that she could not recall when she ordered a new table, and would have verify the date by reviewing the purchase order. *Id.* It is not disputed that the new table did not have straps or a bar to prevent a child from rolling off the table; Anderson did not order a table with such security devices because it "wasn't recommended." *Id.*, p. 180-181.

It is not disputed that, on May 8, 2006, C. M. fell from the new changing table at Harmony school. The new table was approximately 17 inches from the floor, which was not padded. At the time of C.M.'s fall, two aides were present; however, while looking for a fresh diaper, both turned away from the table, and C. M. rolled over and fell onto the floor. Anderson testified that, if either the original table or the new table had been equipped with a bar or a strap, C. M. would "possibly not" have fallen. Anderson Dep., P Ex.1, p. 182, lines 19-25.

On the day following C. M.'s May 8, 2006 fall, Anderson sent a memorandum to Hensch instructing her to stop using the new changing table:

> This letter is to inform you that effective immediately, if [C.M.] needs to be changed, he will need to be changed on a matt [sic] placed on the floor. The changing table is not to be used until such time a device or strap or bar can be secured to it to prevent him from rolling off the table.

May 9, 2006 memorandum from Anderson to Hensch, P. Ex. 26.

Defendants contend that the material facts in evidence establish that Plaintiffs cannot prove, as a matter of law, that Defendants were deliberately indifferent to the safety of C. M. with regard to the changing table, arguing that C. M. had been changed on the same table for several years without incident and that Miles did not complain about the table after the 2002 school year. Thus, Defendants contend that they could not have known that the table presented a risk. In response, Plaintiffs argue that their deliberate indifference claim is not based only on C. M.'s falls from the changing table, but that Defendants were deliberately indifferent to his safety at Harmony on the

basis of the other allegations they assert.  Even if the claims were limited to the changing table, however, Plaintiffs argue that the evidence is sufficient to create a material factual dispute regarding deliberate indifference as to that issue.

Defendants cite no authority holding that a § 504 or Title II deliberate indifference claim of intentional discrimination is limited to a specific instance resulting in harm to the disabled individual.  Plaintiffs also fail to cite authority directly addressing this question in a § 504 or Title II case.  However, Plaintiffs suggest that the Fifth Circuit decision in *Hernandez ex rel. Hernandez v. Texas Dept. of Protective and Regulatory Services*, 380 F.3d 872, 882 (5th Cir. 2004) offers persuasive authority for their view that, when considering a claim based on deliberate indifference, the Court must consider conduct beyond the incident which directly caused the individual's harm.

In *Hernandez*, the court considered the sufficiency of the deliberate indifference evidence in the context of a 42 U. S. C. § 1983 case involving a foster child who died of suffocation; the parents alleged, *inter alia*, that the state agency was deliberately indifferent to the child's safety. The defendants argued that they could not have been deliberately indifferent as a matter of law because they had no notice of the risk of suffocation.   The Fifth Circuit rejected that argument, holding that the question of deliberate indifference was not limited to the incident which resulted in injuries:

> Here, the central inquiry for a determination of deliberate indifference must be whether the state social workers were aware of facts from which the inference could be drawn, that placing children in the...foster home created a substantial risk of danger.  We need not address the form that such a risk might eventually manifest.

380 F.3d at 882.  The Fifth Circuit  found that the issue was not whether the defendants were on notice that  a particular type of harm might occur, but whether there was sufficient evidence that a general risk of harm existed; accordingly, a defendant "cannot escape deliberate indifference

15

liability by arguing that the risk of harm arises from a source not contemplated." *Id.*

The Tenth Circuit has not adopted this specific holding, and has not addressed in detail a factual situation similar to that alleged in this case. Where deliberate indifference is at issue in a § 504 case, this circuit has held that "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Powers*, 184 F.3d 1147 at 1153. The court in *Powers* did not decide whether the defendant had to be aware of the specific risk of harm that led to an injury.

Having reviewed the decisions in this and other circuits, the Court concludes that the protections afforded by § 504 and Title II should not be narrowly construed. Both federal laws are designed to prohibit disability discrimination in connection with the provision of public programs; the Court concludes that the reasoning in *Hernandez* is applicable to a claim of deliberate indifference in a § 504 or Title II case, particularly where the claim is based on the safety and well-being of disabled children in connection with educational services in which they have a right, under federal law, to participate without being subjected to discrimination. Thus, the Court concludes that, under the facts and circumstances of this case, the deliberate indifference which Plaintiffs must prove is not limited only to the risk of harm resulting from the changing table or procedures related to changing C.M.'s diaper. Instead, to support their claim of deliberate indifference, the Plaintiffs may offer and rely on evidence of their other complaints regarding C.M. and his participation in educational programs provided by Defendants.

Conclusion:

The Court concludes that the record contains sufficient evidence to create material factual disputes with regard to Plaintiffs' claims that Defendants intentionally discriminated against C.M. by exhibiting deliberate indifference to the likelihood that their actions, or their failure to act, violated his rights under the Rehabilitation Act and the ADA. Even if deliberate indifference applies only to the incidents involving the changing table and the procedures employed when C.M. was being changed, Plaintiffs have presented sufficient evidence to create a material factual dispute regarding that claim.   Therefore, Defendants' Motion [Doc. No. 63] is DENIED.

IT IS SO ORDERED this  16th   day of October, 2008.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE